**GOOD GUSTAFSON AUMAIS LLP**
J. RYAN GUSTAFSON (220802)
CHRISTOPHER B. GOOD (232722)
2330 Westwood Boulevard, Suite 103
Los Angeles, California 90064
Telephone:  310.274.4663
Email: jrg@ggallp.com
Email: cbg@ggallp.com
Email: seh@ggallp.com
Email: service@ggallp.com

*Attorneys for Plaintiff,*
*ROBERT LINEBARGER*

Electronically FILED by
Superior Court of California,
County of Los Angeles
3/23/2026 11:39 AM
David W. Slayton,
Executive Officer/Clerk of Court,
By Y. Ayala, Deputy Clerk

## LOS ANGELES COUNTY SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| ROBERT LINEBARGER,<br><br>Plaintiff,<br><br>vs.<br><br>BIRCH GOLD GROUP, a California corporation, and DOES 1-20, inclusive,<br><br>Defendants. | Case No. 26STCV09249<br><br>**COMPLAINT**<br><br>1. **Fraud;**<br>2. **Negligent Misrepresentation;**<br>3. **Negligence;**<br>4. **Violation of California Business and Professions Code § 17200,** *et seq.*<br>5. **Breach of Warranty;**<br>6. **Unjust Enrichment; and**<br>7. **Breach of Written Contract** |

Plaintiff ROBERT LINEBARGER, an individual, ("PLAINTIFF"), by and through his counsel, hereby bring this Complaint against BIRCH GOLD GROUP, an Iowa limited partnership ("BIRCH"), and DOES 1 through 20, inclusive, (collectively, "DEFENDANTS"), alleging, upon knowledge as to himself and his known acts, and upon information and belief as to all other matters, the following:

## I. THE PARTIES

1. PLAINTIFF is a resident of the State of Washington. He is a manager at Cisco Systems and is approximately 60 years of age.

2. BIRCH is an Iowa limited partnership. BIRCH is registered to do business in the State of California, and upon information and belief, maintains offices located at 3500 W. Olive Avenue, Suite 300, Burbank, CA 91505, and 3500 W. Olive Avenue, Suite 730, Burbank, CA 91505.

3. The true name and capacities, whether individual, corporate, partnership, associate or otherwise, of Defendants sued herein as a DOE is legally responsible in some manner for the events and happenings referred to herein and caused injury and damage proximately thereby to PLAINTIFF as hereinafter alleged. PLAINTIFF will seek leave of court to amend this Complaint to show the true names and capacities of the Defendants designated herein as DOES when the same has been ascertained.

## II. ALTER EGO ALLEGATIONS

4. At all times mentioned herein, DEFENDANTS, and each of them, were and now are individuals, corporations, partnerships, associations, limited liability companies, joint ventures and/or sole proprietorships who were the agents, alter egos, servants, employees and/or co-conspirators of

1

COMPLAINT

each other and of each of said other co-defendants and were, as such, acting within the time, place, purpose and scope of said agency, alter ego, service and employment, and/or co-conspiracy.

### III.   JURISDICTION

5.     All of the acts complained of herein took place within the jurisdiction of the above-captioned court.  Further, all DEFENDANTS may be found within the jurisdiction of the above-captioned court.

### IV.   FACTUAL ALLEGATIONS

6.     While seeking safe havens for his retirement investments, PLAINTIFF saw a commercial produced by BIRCH, which prominently featured Steve Bannon who praised the trustworthiness of BIRCH and BICRH's reputation for honesty and transparency.  In reliance of the commercial produced by BIRCH, PLAINTIFF contacted BIRCH and requested a copy of the book that was being pitched by Steve Bannon in the BIRCH commercial.  Though the book never arrived, BIRCH began contacting PLAINTIFF to solicit his purchases of precious metals from BIRCH.

7.     PLAINTIFF reposed trust in BIRCH and spoke with an agent/employee of BIRCH, who held himself out as someone with significant knowledge of precious metals and investments in precious metals.

8.     PLAINTIFF informed the agents/employees of BIRCH that he was seeking high quality investments that would increase in value over time.  Agents/employees of BIRCH assured PLAINTIFF that they understood his concerns, and that BIRCH would only provide quality, conservative investments to PLAINTIFF.

9.     Upon the advice of agents/employees and his representations regarding BIRCH, PLAINTIFF made an initial investment of approximately with BIRCH in October of 2022.

2

COMPLAINT

10.    PLAINTIFF'S investment consisted of 11 100-ounce Silver Bar .999 for a price of $25,493.27, and 420 ¼ ounce Gold Twin Maple .9999 for a price of 284,340.00.   The total purchase price was $309,833.27, as seen below in Figure 1 (the "FIRST PURCHASE").

| Quantity | Coin | Grade | Unit Price | Total Price |
|---|---|---|---|---|
| 11.0 | 100 oz Silver Bar .999 | Bullion | $2,317.57 | $25,493.27 |
| 420.0 | 1/4 oz Gold Twin Maple .9999 | Fixed Mintage | $677.00 | $284,340.00 |
| | | | Total: | $309,833.27 |

At the urging of BIRCH, in February of 2023, PLAINTIFF purchased 59 Gold Canadian 0.25 Twin Leaf .9999 coins, at a price of $762.53/coin, for a total purchase price of $44,915.17 as shown Below in Figure 2 (the "SECOND PURCHASE").

Customer Account: 2552967

| Quantity | Coin | Grade | Unit Price | Total Price |
|---|---|---|---|---|
| 59.0 | Gold Canadian 0.25 oz Twin Leaf .9999 | Fixed Mintage | $762.63 | $44,995.17 |
| | | | Total: | $44,995.17 |

11.    In total, PLAINTIFF purchased $354,828.44 worth of precious metals from BIRCH in 2 separate purchases.

12.    BIRCH's website boasts:

*With your retirement at stake, you want to be confident in the financial services companies that you work with—including whom you choose for purchasing physical precious metals.  You need to put your savings into the hands of an experienced and well-respected dealer in gold, silver and other precious metals. Sleep better at night with a proven industry leader in your corner, someone who can show you how*

3

COMPLAINT

*precious metal investments can protect your lifestyle and retirement—even when the*

*economy gets shaky.*[1]

13.    BIRCH also places several celebrities on its website that supposedly endorse BIRCH. Including, among others, Dan Bongino, Megyn Kelly, Ron Paul, Steve Bannon, and Clay Travis and Buck Sexton.  For his part, Ron Paul is quoted as saying "*Birch Gold Group is the gold standard for helping Americans diversify their retirement*".  One can also order a "warning" about the future allegedly authored by Ron Paul entitled "Dispatches to Future Generations".[2]

13.    BIRCH also claims numerous accreditations and ratings that help to bolster its business image and lull consumers into a false sense of safety and security.[3]

   

14.    DEFENDANTS operate a sales and telemarketing operation for the primary purpose of selling precious metals directly to consumers over the telephone and via the Internet.  DEFENDANTS themselves, by and through various employees, make hundreds of intrastate and interstate sales calls per month — via the telephone — and ship precious metals by the interstate mails and private interstate delivery services.  DEFENDANTS frequently utilize one or more of the following unlawful, false, misleading and unconscionable sales tactics:

(i)    Misrepresenting attributes of graded bullion (or "certified coins") to convince customers to move from bullion to over-priced coins;

(ii)    misrepresenting qualities of the coins with promises that the investment in "certified coins" will substantially appreciate, all the while increasing the population of "certified coins" with sales to others;

---

[1] https://www.birchgold.com/the-birch-difference/
[2] https://www.birchgold.com/?v7=true
[3] https://www.birchgold.com/?v7=true

(iii) offering a short term "money back guarantee" which provides no real opportunity to investigate the true value of the coins;

(iv) advising customers to purchase "unique" bullion coins, when the coins are not, in fact, unique;

(v) misrepresenting to customers that "certified coins" will outperform other types of investments—without any specific underlying data supporting such assertions;

(vi) Using grading and marketing to deceptively sell bullion as some type of "modern numismatics," even though there are very large populations of the high-grade bullion coins or the "certification" is commonly duplicated with minor expense;

(vii) misrepresenting the market value of "certified coins" in the customer portal to prevent or delay consumers from determining the actual market price of bullion coins.

(viii) claiming a volatile market based upon the spot price of gold yet selling bullion coins at such exorbitant and fraudulent prices to make "market price" nothing but a gimmick;

(ix) selling coins at overly inflated premiums that are not adequately disclosed to consumers;

(x) failing to display, disclose, or file required information regarding telephone solicitations; and

(xi) various other acts and practices that may be uncovered during discovery.

15.    In October of 2025, PLAINTIFF called BIRCH seeking information about the purchases he made. Specifically, PLAINTIFF was concerned that while there had been a significant price increase in the price of gold from the date of his purchases in late October of 2022 and February of 2023, his account values remained static. Ordinarily, one would reasonable expect that an historic uptick in the price of precious metals would correspond with an uptick in the values of one's precious metals investments

16.    PLAINTIFFF then asked the agent/employee of BIRCH the current value of his purchases and was given conflicting information about the price he paid, the buy-back price of his investments, the "spot price" of precious metals, and the "bid/ask" of precious metals (commonly known as the

5

COMPLAINT

"spread") all done in an effort to confuse PLAINTIFF and obscure the true value of PLAINTIFF'S precious metal purchases from BIRCH.

17.    Generally, most precious metals sold by BIRCH are not numismatic or semi-numismatic coins. For instance, a numismatic coin is considered a collectible, rare, or historically significant coin that has inherent value *apart* from its metal composition. For instance, a coin found on the shipwreck of the *Titanic* would be considered a numismatic coin. Numismatic coins trade at a premium due to their unique pedigree. Semi-numismatic coins are not as rare as numismatic coins but are valued for their metal content and rarity. Semi-numismatic coins trade at a premium, though not nearly the premium associated with numismatic coins.

18.    BIRCH deals primarily with bullion coins. Bullion coins, unlike numismatic or semi-numismatic coins are generally worth what is known as the "melt value", that is the amount of money a purchaser would pay for the metal contained within the coin itself. Bullion coins have no inherent value apart from what they weigh in any particular sort of metal (*e.g.* platinum, gold, or silver). In other words, a bullion coin, should in theory cost the same as the same weight of a particular quantity of the precious metal of which the coin is made, and no premium is paid for the historical pedigree or collectability of the coin. Bullion coins generally trade at or near the "spot" price of the metal - that is the real time price for a particular quantity of the metal (usually one troy ounce) plus a small (reasonable) premium to cover minting costs, overhead, and storage fees, for example. BIRCH attempts to confuse consumers by offering "limited edition" coins to consumers. However, the coins offered to customers are not truly "limited edition" and do not have extrinsic value, and are, for all intents and purposes, bullion coins.

19.    PLAINTIFF'S purchase of the Gold Twin Maple coins (the "GOLD TWINS") on October 22, 2022, is a prime example of the price manipulation foisted upon BIRCH customers.

6

COMPLAINT

Figure 3.



17.  Figure 3 shows that BIRCH charged an astonishing 64.06% premium for PLAINTIFF'S FIRST PURCHASE of GOLD TWINS.  (Figure 3 assumes that a reasonable premium of 6.44% would have been charged by APMEX, a reputable precious metal dealer).  Assuming a reasonable premium of 6.44% still leaves BIRCH with an unconscionable 57.62% premium on PLAINTIFF's purchase of the GOLD TWINS.  Of course, this was never disclosed to PLAINTIFF.  Had it been disclosed, PLAINTIFF would never have purchased the GOLD TWINS as recommended to him by agents/employees of BIRCH.  At the level of premium charged by BIRCH, PLAINTIFF would have to receive an increase in the BIRCH TWINS of nearly 58% until he had broken even in the GOLD TWINS investment.  This represents an overcharge to PLAINTIFF of approximately $99,860.68.

18.  Figure 4 (below) illustrates the outsized premium charged by BIRCH to PLAINTIFF.  This also helps illustrate the lost opportunity cost to PLAINTIFF.  But for the staggering,

COMPLAINT

undisclosed premiums paid by PLAINTIFF to BIRCH in the FIRST PURCHASE, PLAINTIFF would have nearly $100,000 to invest in either precious metals or other investments.

Figure 4



8

Figure 5



19.     Figure 5 shows a similar pattern in connection with PLAINTIFF'S SECOND PURCHASE. On the SECOND PURCHASE, PLAINTIFF paid nearly 37% in undisclosed premiums to BIRCH. Had PLAINTIFF known that he was being assessed a 37% premium in the SECOND PURCHASE, he would not have made the SECOND PURCHASE.

20.     In October of 2025, after a historic upward run in the precious metals markets (specifically, gold and silver), PLAINTIFF grew concerned that the FIRST PURCHASE and the SECOND PURCHASE had not kept pace with the upward trend in precious metals pricing.

21.     Thereafter, in October, PLAINTIFF called BIRCH and complained that he paid a nearly 60% premium on the FIRST PURCHASE, which was denied by the agent/employee of BIRCH.

9

COMPLAINT

22.    In November of 2025, PLAINTIFF again called BIRCH and spoke to JAY BLASKEY, an agent/employee of BIRCH.  During this call, PLAINTIFF inquired whether BIRCH would repurchase the GOLD TWINS.  Specifically, PLAINTIFF was concerned that he had overpaid for the GOLD TWINS and was hoping that BIRCH would repurchase the GOLD TWINS.  JAY BLASKEY cautioned PLAINTIFF that PLAINTIFF should "manage his expectations" for a decent repurchase price because most people held their purchases from BIRCH for 3-5 years.  At this point, PLAINTIFF reminded MR. BLASKEY that PLAINTIFF had purchased the GOLD TWINS over 3 years ago.  MR. BLASKEY then proceeded to provide PLAINTIFF with yet another rambling narrative about t precious metals pricing.  He stated (as did the previous agent/employee of BIRCH) that there were discrepancies in the "bid/ask" price of precious metals, and claiming that Birch had an "exclusivity" on the GOLD TWINS, which affected the pricing of the GOLD TWINS, and that the precious metals market was being manipulated by unknown "vendors".

23.    Near the end of the conversation, PLAINTIFF again requested repurchase pricing and MR. BLASKEY told PLAINTIFF that he would return PLAINTIFF'S call once MR. BLASKEY had obtained accurate pricing information.

24.    The following day, MR. BLASKEY called PLAINTIFF and commenced with a long explanation of why he could not provide real-time, transparent pricing information to PLAINTIFF.

25.    PLAINTIFF then told MR. BLASKEY that based on his earlier conversations with MR. BLASKEY, PLAINTIFF was under the impression that he was purchasing premium coins (the GOLD TWINS), and that accordingly, they would appreciate quicker than other coins.  Once again, MR. BLASKEY attempted to mislead PLAINTIFF and insisted that although PLAINTIFF had purchased premium coins, there were third parties that were manipulating the price of the GOLD TWINS.

COMPLAINT

26.     Several days later, PLAINTIFF and MR. BLASKEY spoke again.  PLAINTIFF sought accurate pricing on the GOLD TWINS.  MR. BLASKEY said that he could not get current pricing for PLAINTIFF and once again offered numerous explanations for the inability of BIRCH to provide accurate pricing for the GOLD TWINS.  For instance, he once again brought up the spot price of gold and compared it to the pricing of oil.  He also discussed wholesale pricing of gold, and "bid/ask" spreads.  Despite his inability to provide PLAINTIFF with accurate pricing information for his current purchases from BIRCH, MR. BLASKEY attempted to sell additional coins to PLAINTIFF during this call.

27.     PLAINTIFF further alleges, upon information and belief, that BIRCH encouraged a culture that actively promoted: (1) allowing employees of BIRCH to make misrepresentations regarding the value of its clients' investments, and the supposed quality of investments offered by BIRCH; and (2) an atmosphere that incentivized BIRCH employees to work against the best interests of BIRCH clients to unjustly enrich BIRCH.

28.     PLAINTIFF still cannot discern the value of his holdings purchased from BIRCH. DEFENDANTS have ceased communicating with PLAINTIFF.

29.     As a result of the misconduct (described herein) of DEFENDANTS, PLAINTIFF has been damaged in an aggregate amount of at least $500,000.00, such amount representing the amount of overcharges made by BIRCH, as well as the lost opportunity cost due to BIRCH'S less the value of the investments to date.

## V.     CLAIMS FOR RELIEF

### A.     FIRST CLAIM FOR RELIEF - FRAUD AND FRAUDULENT CONCEALMENT

(Against All DEFENDANTS)

30.     PLAINTIFF realleges and incorporates by reference all paragraphs set forth above.

11

COMPLAINT

31.     To sell overvalued coins to PLAINTIFF, DEFENDANTS utilized one or more of the above unlawful, false, misleading, and unconscionable high-pressure sales tactics typical of the precious metals/coins/bullion direct sales industry.  Specifically, DEFENDANT and their employees falsely and/or misleadingly represented to PLAINTIFF that the GOLD TWINS sold to PLAINTIFF were superior in value to other investments, that PLAINTIFF was getting a superior deal, and preferred pricing on the GOLD TWINS because they were "exclusive coins" and carried a premium above and beyond their melt value. DEFENDANTS, their employees, and agents also falsely represented and obscured the current fair market value of the GOLD TWINS with full knowledge that they were not worth a fraction of the value at which they were sold and purchased and that the coins would not attain anything resembling the return of investment as promised.

32.     DEFENDANTS, by and through their salespersons, their employees, and agents made the above false representations to PLAINTIFF with the intent that he upon them and with full knowledge that such representations were false when made.  PLAINTIFF relied on DEFENDANTS' material and false representations when deciding to purchase the grossly overvalued coins which they purchased to their financial detriment and DEFENDANTS' financial gain.  As a direct and/or proximate result of DEFENDANTS' false and misleading representations about the overvalued coins, PLAINTIFF suffered (and continues to suffer) damages in the form of, *inter alia,* the amounts paid to DEFENDANTS for the coins in excess of their value, as well as lost opportunity cost.

33.     DEFENDANTS also concealed their wrongful actions until a significant amount of the damage to PLAINTIFF was done.  DEFENDANTS continuously (1) claimed to be working on providing PLAINTIFF with an update as to his account holdings, (2) promising to send PLAINTIFF account documentation, and (3) working to prevent PLAINTIFF from knowing the true value of his accounts and the status of the accounts.  All the foregoing facts were material to PLAINTIFF'S

12

COMPLAINT

decision to keep their investments at BIRCH, and BIRCH worked scrupulously to keep PLAINTIFF in the dark to prevent him from trying to sell the GOLD TWINS sold by BIRCH.

34.     By virtue of the confidential business relationship between PLAINTIFF and DEFENDANTS, DEFENDANTS had a duty to disclose the above-described concealed material facts to PLAINTIFF. DEFENDANTS' deliberate silence, when they had a duty to speak, and the resulting nondisclosure of the concealed material facts, is the equivalent of false representations and/or omissions.  Such false representations and/or omissions were made knowingly and intentionally or in reckless disregard of PLAINTIFF'S rights and interests.

35.     PLAINTIFF justifiably relied on DEFENDANTS' false representations and/or omissions to his financial detriment by purchasing overvalued coins and then being forced to hold them while DEFENDANTS actively worked to conceal their wrongful acts.  DEFENDANTS' wrongful actions constitute fraud under California law.

36.     DEFENDANTS concealed their wrongful actions with the intent to mislead and defraud PLAINTIFF.  PLAINTIFF was not aware of, nor, through the exercise of due diligence, could he have become aware of DEFENDANTS' wrongful actions until such wrongful actions were brought to light by third parties.  Due to the Parties' confidential business relationships, which were predicated on their mutual trust and confidence, and DEFENDANTS' superior knowledge and/or means of knowledge, DEFENDANTS had a duty to disclose to PLAINTIFF the above-described materially false information.  DEFENDANTS' failure to do so constitutes fraudulent concealment under California law.

37.     As a result of the wrongful conduct of DEFENDANTS as herein described, PLAINTIFF has been damaged in an amount of at least $500,000.00, such amount to be proven at trial.

13

COMPLAINT

**B.      SECOND CLAIM FOR RELIEF - NEGLIGENT MISREPRESENTATION**

(Against all DEFENDANTS)

38.      PLAINTIFF realleges and incorporates by reference all paragraphs set forth above.

39.      DEFENDANTS made certain representations to PLAINTIFF in the course of their business and in transactions in which DEFENDANTS had a substantial monetary interest.  DEFENDANTS also supplied false information for the specific purpose of guiding PLAINTIFF in his purchase of the coins that BIRCH urged that he purchase.

40.      DEFENDANTS, however, failed to exercise reasonable care and competence in obtaining and communicating such information to PLAINTIFF by, *inter alia,* utilizing one or more of the above unlawful, false, misleading, and unconscionable sales tactics typical of the precious metals/coins/bullion direct sales industry and/or making the above false and material misrepresentations and omissions regarding PLAINTIFF'S accounts at BIRCH.

41.      PLAINTIFF justifiably relied on DEFENDANTS' negligent misrepresentations when purchasing the grossly overvalued coins, which directly and/or proximately caused him to suffer damages to the financial benefit of DEFENDANTS. PLAINTIFF continued to justifiably rely upon DEFENDANTS' negligent misrepresentations regarding the grossly overvalued, which directly and/or proximately caused him to suffer damages to the financial benefit of DEFENDANTS. DEFENDANTS' wrongful conduct constitutes negligent misrepresentation under California law.

42.      As a result of the wrongful conduct of DEFENDANTS as herein described, PLAINTIFF has been damaged in an amount of at least $500,000.00, such amount to be proven at trial.

COMPLAINT

## C.   THIRD CLAIM FOR RELIEF – NEGLIGENCE

### (Against all DEFENDANTS)

43.   PLAINTIFF realleges and incorporates by reference all paragraphs set forth above.

44.   DEFENDANTS negligently valued, promoted, marketed, advertised, and sold grossly overvalued coins to PLAINTIFF.  In doing so, DEFENDANTS owed a duty to PLAINTIFF to exercise reasonable care in valuing, promoting, marketing, advertising and selling the coins, providing an inventory and/or value of the coins purchased by PLAINTIFF.  DEFENDANTS breached their duty to PLAINTIFF by failing to exercise reasonable care in valuing, promoting, marketing, advertising, and selling the coins to PLAINTIFF.

45.   DEFENDANTS' wrongful conduct directly and/or proximately caused PLAINTIFF to suffer damages in an amount of at least $500,000.00.  DEFENDANTS' wrongful conduct constitutes negligence under California law.

## D.   FOURTH CLAIM FOR RELIEF- UNFAIR BUSINESS PRACTICES

### (Against all DEFENDANTS)

46.   PLAINTIFF realleges and incorporates by reference all paragraphs set forth above.

47.   California Business and Professions Code, Section 17200, states in pertinent part "*unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code.*"

48.   By their above wrongful acts and/or misrepresentations on the website located at www. https://www.birchgold.com, DEFENDANTS engaged in false, misleading, deceptive, unlawful, unfair and fraudulent business acts and practices in violation of Business and Professions Code,

Section 17200, *et, seq*.  DEFENDANTS, *inter alia:* (i) represented that the coins purchased by PLAINTIFF had value that they did not (and do not have) and that significant investor and collector demand exists for the coins that will cause them to appreciate in value, which does not exist and will not happen; (ii) represented that the coins purchased by PLAINTIFF are rare and/or unique and have substantial desire to investors and collectors (which they are not, and do not), which will cause the coins to appreciate significantly in the near future (which they have not and will not) and, (iii) failed to disclose the above information about the coins purchased by PLAINTIFF, which DEFENDANTS knew at the time of the transactions, with the intent to induce PLAINTIFF to purchase the coins that PLAINTIFF would not have purchased had DEFENDANTS disclosed such information.

49.    As a result of the wrongful conduct of DEFENDANTS as herein described, PLAINTIFF has been damaged in an amount of at least $500,000.00, such amount to be proven at trial.

## E.    FIFTH CLAIM FOR RELIEF - BREACH OF EXPRESS WARRANTY

### (Against all DEFENDANTS)

50.    PLAINTIFF realleges and incorporates by reference all paragraphs set forth above.

51.    California Commercial Code ("Cal Comm. Code") provides:  *"(a) Any affirmation of a fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates and express warranty that the goods shall conform to the affirmation or promise," " and (b) Any description of the goods which is made part of the basis of the bargain creates and express warranty that the goods shall confirm to the description."* Cal. Comm. Code § 2313.

52.    By their above wrongful acts and/or misrepresentations regarding the quality and value of the GOLD TWINS sold to PLAINTIFF created an express warranty.  DEFENDANTS violated Cal.

16

COMPLAINT

Comm. Code § 2313 as the statements were not true when made, and the descriptions of the goods sold by DEFENDANTS do not conform to the strictures of Cal. Comm. Code § 2313.

53.    As a result of the wrongful conduct of DEFENDANTS as herein described, PLAINTIFFS have been damaged in an amount of at least $150,000.00, such amount to be proven at trial.

### F.    SIXTH CLAIM FOR RELIEF - UNJUST ENRICHMENT

#### (Against all DEFENDANTS)

54.    PLAINTIFF realleges and incorporates by reference all paragraphs set forth above.

55.    DEFENDANTS (and possibly other persons and entities, including DEFENDANTS' employees) have been unjustly enriched by (i) being paid an excessive value for coins that are not supported by any reasonable valuation, (ii) using the fraudulently obtained revenues and profits paid by PLAINTIFF, and (iii) generating a return on the amounts described in (i) and (ii).  Accordingly, PLAINTIFF seeks to impose a constructive trust over (and recover) all amounts by which DEFENDANTS (and possibly other persons and entities, including DEFENDANTS' employees) have been unjustly enriched.

56.    As a result of the wrongful conduct of DEFENDANTS as herein described, PLAINTIFF has been damaged in an amount of at least $500,000.00, such amount to be proven at trial.

### G.    SEVENTH CLAIM FOR RELIEF – BREACH OF CONTRACT

#### (Against BIRCH)

57.    A written contract (the "CONTRACT") existed by and between PLAINTIFF and BIRCH.

58.    PLAINTIFF performed (or was excused from performance) under the terms of the CONTRACT.

COMPLAINT

59.     BIRCH breached the contract by *inter alia*: (1) failing to disclose excessive premiums for the purchases made by PLAINTIFF; (2) withholding material information about the true value of the purchases made by PLAINTIFF; and (3) actively working against the interests of PLAINTIFF to frustrate the terms and purpose of the CONTRACT.

60.     As a result of the breaches of the CONTRACT by BIRCH as herein described, PLAINTIFF has been damaged in an amount of at least $500,000.00, such amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** PLAINTIFF requests that upon final trial or hearing, judgment be awarded against the DEFENDANTS, jointly and severally for:

(1)     Rescission;

(2)     Damages in an amount to be proven at trial;

(3)     Punitive damages;

(4)     Treble damages;

(5)     All amounts by which DEFENDANTS have been unjustly enriched;

(6)     An equitable accounting for all benefits, consideration, and profits received, directly or indirectly, by DEFENDANTS, including imposing a constructive trust, the voiding of unlawful transfers, and the disgorgement of all ill-gotten gains and profits;

(7)     Pre- and post-judgment interest on all amounts awarded;

(8)     Attorneys' fees and costs of suit;

(9)     Auch other and further relief that the Court deems just and proper.

18

COMPLAINT

Dated:  March 13, 2026                        Respectfully submitted,

                                      **GOOD GUSTAFSON AUMAIS LLP**


                                      By:  ___s/ J. Ryan Gustafson___
                                      J. RYAN GUSTAFSON

                                      *Attorneys for PLAINTIFF*


## DEMAND FOR JURY TRIAL

PLAINTIFF hereby demands trial by jury on all issues so triable.


Dated:  March 13, 2026                        Respectfully submitted,

                                      **GOOD GUSTAFSON AUMAIS LLP**


                                      By:  ___s/ J. Ryan Gustafson___
                                      J. RYAN GUSTAFSON

                                      *Attorneys for PLAINTIFF*

19

COMPLAINT